United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE MANN, | ) No. C 07-0781 MMC (PR) |
| Plaintiff, | ) **ORDER GRANTING DEFENDANTS'** |
| | ) **MOTION FOR SUMMARY JUDGMENT;** |
| v. | ) **DENYING MOTION FOR** |
| | ) **APPOINTMENT OF MEDICAL EXPERT** |
| DR. C. LEE, et al., | ) |
| | ) **(Docket Nos. 33, 48)** |
| Defendants. | ) |
| _____ | ) |

On February 6, 2007, plaintiff, a California prisoner then incarcerated at Salinas Valley State Prison ("SVSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983 against various SVSP employees.[1] By order filed May 29, 2007, the Court reviewed the complaint and found plaintiff's allegations stated cognizable claims for relief against defendants Dr. Bowman, Dr. Lee and Dr. Milner. Now before the Court is the joint motion for summary judgment filed by said defendants. Plaintiff has filed opposition to the motion, defendants have filed a reply, and plaintiff has filed a sur-reply.

//

//

---

[1] Plaintiff currently is incarcerated at Kern Valley State Prison.

BACKGROUND[2]

The instant action concerns the medical care received by plaintiff at SVSP for back-related symptoms over the course of an approximately two and one-half year period between January 2005 and May 2007. The relevant events begin on January 19, 2005, when plaintiff was seen by a nurse at the SVSP medical facility for complaints of a sudden onset of partial paralysis and acute chest pain. Plaintiff was transported from SVSP to an outside hospital for diagnosis and treatment. (Decl. Robert Bowman, MD ("Bowman Decl.") Supp. Mot. Summ. J. ¶ 4 & Ex. MANN008.) The hospital MRIs revealed no intracranial hemorrhage, and found mild bulging of the spine, with some stenosis and spondylosis.[3] (Bowman Decl. ¶ 5 & Ex. MANN274-275.)

At a post-discharge follow-up appointment at SVSP on January 27, 2005, plaintiff complained of a tingling sensation in both legs. The attending physician noted in the medical records that plaintiff's motor and sensory functions were intact; he prescribed a non-steroidal anti-inflammatory medication. (Bowman Decl. ¶ 6 & Ex. MANN010.)

On February 13, 2005, plaintiff complained to a nurse at the SVSP medical facility that he had twisted his back. (Bowman Decl. Ex. MANN439.)

On February 22, 2005, plaintiff was seen at SVSP by a physical therapist for a consultation. Plaintiff complained of back and leg pain, numbness and difficulty walking. Plaintiff was prescribed physical therapy to assist him with symptom reduction and in walking with crutches. (Id. Ex. MANN444.)

On April 5, 2005, at a medical appointment at SVSP, plaintiff complained of low back pain and numbness in his right leg. The attending physician observed that plaintiff's lower

---

[2] The following facts are undisputed and are derived from plaintiff's verified complaint and the parties' exhibits. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (verified complaint may be used as opposing affidavit under Rule 56 if based on personal knowledge and sets forth specific facts admissible in evidence). Where the following account reflects an absence of facts as to the description of any event or as to what took place between events, the parties have not provided further clarification.

[3] Stenosis refers to a narrowing of the spinal canal, and spondylosis refers to spinal vertebral degeneration.

back was tender but also noted plaintiff was "walking well." The doctor prescribed an x-ray of plaintiff's spine, refilled plaintiff's prescription for a non-steroidal anti-inflammatory medication, added a prescription for a muscle relaxant, and advised plaintiff to return for a follow-up appointment in thirty days. (Bowman Decl. ¶ 9 & Ex. MANN012.)

On May 10, 2005, plaintiff was seen for the first time for his back problems by defendant Dr. Bowman. Plaintiff complained of lower back pain and weakness in his entire right side. Dr. Bowman, in addition to prescribing muscle relaxants and a pain medication, wrote plaintiff a referral for a neurosurgery consultation. (Bowman Decl. ¶ 10 & Ex. MANN014.)

On June 17, 2005, defendant Dr. Milner interacted with plaintiff for the first time when Milner prescribed medication for plaintiff in preparation for plaintiff's having MRIs taken of his cervical and lumbar spine. (Bowman Decl. ¶ 11 & Ex. MANN108.) The MRI reports, prepared by the radiologist on June 22, 2005, showed disk bulges at several places in plaintiff's spine with mild spinal cord flattening and foraminal narrowing.[4] (Bowman Decl. ¶ 11 & Ex. MANN279-280.)

On August 9, 2005, plaintiff complained to a nurse at SVSP that he was experiencing ongoing back pain and weakness. Plaintiff was referred for an EMG and nerve conduction tests. (Bowman Decl. ¶ 12 & Exs. MANN015, 110.) The tests were performed on September 30, 2005 and were normal. (Bowman Decl. Ex. MANN017.) On October 12, 2005, at a follow-up appointment, plaintiff complained to a nurse at SVSP that he was experiencing persistent numbness and weakness of his lower extremities. The nurse's notes show plaintiff's treatment plan for his back problems included a neurology consultation and physical therapy. (Id. & Ex. MANN111.)

At a physical therapy appointment on October 20, 2005, plaintiff complained that his pain extended into his right leg and knee. Plaintiff requested a cane and a back brace. The physical therapist noted that plaintiff should not be referred back to physical therapy absent a

---

[4]Foraminal narrowing is a constricted opening in a bone.

3

significant reduction in pain. (Bowman Decl. ¶ 14 & Ex. MANN440.) On November 14, 2005, plaintiff was prescribed a back brace and a cane. (Bowman Decl. ¶ 14 & Ex. MANN112.)

On November 16, 2005, plaintiff had his neurological consultation with Dr. Muizelaar, a neurosurgeon at U.C. Davis, by way of Telemedicine. (Bowman Decl. ¶ 15 & Ex. MANN019.) The first evidence of defendant Dr. Lee's involvement in plaintiff's care is his receipt of a letter from Dr. Muizelaar on November 21, 2005, in which Dr. Muizelaar reviewed the MRI and EMG reports and concluded that plaintiff's inability to walk was most likely related to pressure on plaintiff's cervical cord in the C5-6 area. He recommended surgery to perform a decompression and inferior cervical fusion in that area. Dr. Muizelaar also recommended, with respect to plaintiff's lower back, that a new EMG of plaintiff's leg be obtained to determine if there was any radiculopathy.[5] (Bowman Decl. ¶ 15 & Ex. MANN321; Bowman Decl. Supp. Reply Ex. Letter dated Nov. 16, 2005.)

On February 2, 2006, the U.C. Davis Neuroscience Clinic faxed a memorandum to SVSP, stating plaintiff had been scheduled for surgery with Dr. Muizelaar. Although the surgery date on the fax transmission is blacked out,[6] the memorandum states that plaintiff's "pre-op package" had to be received at the clinic by no later than February 15, 2006. (Bowman Decl. Supp. Reply Ex. Fax Transmission dated Feb. 2, 2006.)

On February 9, 2006, plaintiff was seen at the SVSP medical facility and complained of ongoing pain and numbness in his back and legs. (Bowman Decl. ¶ 17 & Ex. MANN026.)

On February 15, 2006, plaintiff had a pre-operative physical examination in preparation for his spinal surgery at U.C. Davis. The notes from the examination state that plaintiff had a past history of hypertension and asthma and previously had undergone a cardiac catheterization. (Bowman Decl. ¶ 18 & Ex. MANN023.)

On March 7, 2006, plaintiff fell down and was unable to get up due to numbness in his

---

[5] Radiculopathy is disease of the spinal nerves.

[6] The record contains no explanation as to the reason for such redaction.

4

legs. On Dr. Bowman's orders, plaintiff was catheterized for urine retention, given pain medication and transferred to the prison infirmary. (Bowman Decl. ¶ 19 & Exs. MANN027-031.) A report made by the attending physician the next day, March 8, recommended that Dr. Bowman contact U.C. Davis to arrange for as early a surgery date as possible as it appeared that plaintiff's inability to urinate was being caused by his spinal problems. (Ex. MANN392-395.) On March 9, 2006, Dr. Bowman called the U.C. Davis neurosurgeon to request an earlier surgical appointment for plaintiff. (Bowman Decl. ¶ 20 & Ex. MANN398.)

A week later, on March 16, 2006, plaintiff was released from the prison infirmary. The report by the attending physician states: "The patient has a spinal surgery date made in the region one month from now although we are not given ourselves the exact date. This will be at U.C. Davis." (Bowman Decl. ¶ 21 & Ex. MANN390-391.) Approximately one month later, on April 19, 2006, Dr. Milner saw plaintiff in the prison High Risk Clinic for a follow-up appointment after a change in plaintiff's medication. At that time, Dr. Milner also scheduled a follow-up appointment two days later, for plaintiff's pre-operative clearance for his spinal surgery. (Bowman Decl. ¶ 22 & Ex. MANN033.) On April 21, 2006, Dr. Milner conducted a pre-operative physical examination of plaintiff and recommended that the spinal surgery go forward as scheduled. (Bowman Decl. ¶ 23 & Ex. MANN034.)

On May 8, 2006, plaintiff was admitted to the emergency room at SVSP, based on a complaint of chest pain and pressure. It was determined that plaintiff appeared to be suffering from chest wall pain, possibly from the use of his chest muscles while pushing his wheelchair. The medical record from plaintiff's admission states that plaintiff was awaiting a cardiology consultation prior to his cervical spine surgery. (Bowman Decl. ¶ 24 & Ex. MANN035-038.)

Upon his admission to the emergency room, plaintiff also reported that he had not had a bowel movement in twenty-seven days. After abdominal x-rays were taken, Dr. Milner, on May 11, 2006, sent plaintiff to Natividad Medical Center to be checked for a possible bowel obstruction. (Bowman Decl. ¶ 25 & Ex. MANN045, 413.) On May 13, 2006, plaintiff was returned to SVSP with no complaints. (Bowman Decl. ¶ 26 & Ex. MANN046.)

On June 6, 2006, plaintiff was sent, pursuant to a referral made by Dr. Lee, to Natividad Medical Center for a pre-operative cardiac screening.  On June 9, 2006, plaintiff was returned to SVSP with discharge notes, received on June 12 by Dr. Milner, that recommended plaintiff, due to a borderline EKG, receive further tests before any spinal surgery was performed and that plaintiff then be rescheduled to meet with the cardiologist to be cleared for surgery.  (Bowman Decl. ¶ 27 & Ex. MANN050; Bowman Decl. Supp. Reply ¶ 6 & Ex. Return from Offsite Hospital dated June 9, 2006.)

On June 30, 2006, Dr. Milner requested the recommended tests.  (Bowman Decl. ¶ 28 & Exs. MANN052, 131.)  On August 22, 2006, a thallium scan was performed.  (Bowman Decl. ¶ 29 & Ex. MANN425.)  On September 8, 2006, an ECHO cardiogram was performed.  The nurse who saw plaintiff on September 27, 2006 for a follow-up visit about the test results spoke with Dr. Milner about the results and was told plaintiff could be scheduled for his spinal surgery.  (Bowman Decl. ¶ 30 & Ex. MANN058.)

On November 13, 2006, a physician's request for plaintiff to receive a neurological consultation prior to his surgery was filled out.   On December 13, 2006, plaintiff was seen by a nurse at SVSP for complaints of pain and weakness secondary to his back problems.  The nurse discovered that the November 13 physician's request for a neurological consultation had not been entered into the computer.  The nurse's notes state the request would be entered and Dr. Lee would be informed of the "computer glitch." (Bowman Decl. ¶ 31 & Ex. MANN063-064.)

Two weeks later, on December 28, 2006, plaintiff was carried to the emergency room at SVSP because of severe neck pain and the loss of use of his arms.  The medical record from the incident notes that Dr. Bowman would be scheduling plaintiff's surgery with U.C. Davis.  (Bowman Decl. ¶ 32 & Ex. MANN066-067.)  Due to the delays that had occurred after plaintiff had been cleared for spinal surgery, however, Dr. Lee referred plaintiff to Dr. Kaczmar, a neurosurgeon, for an evaluation.  (Bowman Decl. Supp. Reply ¶ 7.)  Plaintiff was seen by Dr. Kaczmar on January 19, 2007; because Dr. Kaczmar did not have plaintiff's past MRIs, however, he requested that expedited MRIs be taken so that plaintiff could be

evaluated for surgery. (Bowman Decl. ¶ 33 & Ex. MANN325). On January 22, 2007, an SVSP nurse submitted an urgent request for the MRIs. (Bowman Decl. ¶ 33 & Exs. MANN145-146, 260.)

On February 2, 2007, the MRIs were taken. The radiologist's report of that same date showed disc bulging, bony overgrowth encroaching on the spinal canal, some foraminal encroachment, and severe stenosis from dorsal compression. (Bowman Decl. ¶ 34 & Ex. MANN297-298.)

On February 6, 2007, plaintiff filed the complaint in the instant action, asserting a claim under 42 U.S.C. § 1983 based on violation of the Eighth Amendment and alleging he was suffering and in pain and, as of that date, had not received the recommended spinal surgery. (Compl. at 3-3b.)

On February 11, 2007, plaintiff was brought to the emergency room at SVSP with complaints of right arm tingling, chest pressure and pain. Plaintiff was diagnosed as possibly suffering from an acute coronary event, i.e., a heart attack, and was transported by ambulance to Natividad Medical Center. (Bowman Decl. ¶ 36 & Exs. MANN071-077, 152.)

On February 13, 2007, at a chronic care follow-up visit, plaintiff was seen by an SVSP nurse, who spoke to Dr. Lee about the need for an urgent physician's request for a neurological consultation; the nurse's notes of the same date state that plaintiff would be referred to Dr. Kaczmar for the consultation. (Bowman Decl. ¶ 37 & Ex. MANN079.)

On April 16, 2007, plaintiff was seen by Dr. Kaczmar. In a letter to Dr. Lee dated that same date, Dr. Kaczmar notes that the MRIs that had been taken after plaintiff's January 19, 2007 consultation showed spinal cord compression caused by bulging discs and stenosis. Dr. Kaczmar requested authorization for plaintiff to have surgery at the earliest opportunity to relieve the compression. (Bowman Decl. ¶ 38 & Exs. MANN083, 326-327.) In his request for authorization, Dr. Kaczmar wrote: "Mr. Mann is aware that the primary purpose of surgery is to prevent deterioration in the spinal cord function and that return of function already lost is not at all certain. Without surgery, Mr. Mann is aware that there is a risk of catastrophic neurologic deteriorations from spinal cord injury." (Bowman Decl. Ex.

7

MANN326.)

On April 24, 2007, plaintiff came to the emergency room at SVSP with symptoms of decreased mobility, no bowel movement for five days, and no voiding of urine. Dr. Milner examined plaintiff's x-rays and sent plaintiff to Salinas Valley Memorial Hospital for a neurosurgical consultation with Dr. Kaczmar. (Bowman Decl. ¶ 40 & Ex. MANN090.)

On May 1, 2007, plaintiff underwent surgery on his cervical and thoracic spine, performed by Dr. Kaczmar. (Bowman Decl. ¶ 41 & Ex. MANN426-428.)

On May 22, 2007, Dr. Lee sent plaintiff to Corcoran State Prison for rehabilitative care. (Bowman Decl. ¶ 42 & Ex. MANN429.) While there, plaintiff refused physical therapy on several occasions; ultimately, however, he underwent such therapy for two weeks, at the conclusion of which he reported he was no longer benefitting from the treatment. Plaintiff was then discharged back to SVSP. (Bowman Decl. ¶ 43; Bowman Decl. Supp. Reply Exs. Medical Reports dated May 29 & 30, June 12, 13, 14, 18 & 21, 2007; Discharge Orders dated June 25, 2007.)

On July 31, 2007, plaintiff saw Dr. Kaczmar for a three-month post-operative appointment. In a letter to Dr. Lee, Dr. Kaczmar noted plaintiff's incisions were well healed, but that plaintiff continued to experience "a fair degree of lower extremity spasticity." (Bowman Decl. Supp. Reply ¶ 10 & Ex. Letter dated July 31, 2007.) Dr. Kaczmar recommended cervical and thoracic MRIs be taken "to be certain that adequate cord decompression has been accomplished." (Id.) The MRIs were taken on August 15, 2007. (Bowman Decl. Supp. Reply ¶ 11 & Ex. MRI Report dated Aug. 15, 2007.)

On October 15, 2007, plaintiff had another consultation with Dr. Kaczmar, who reviewed the MRI scans and noted, in a letter to Dr. Lee, that the images "showed excellent postoperative appearance with no evidence of spinal cord compression in either the cervical or thoracic region." (Bowman Decl. Supp. Reply ¶ 12 & Ex. Letter dated Oct. 15, 2007.) The letter further noted that plaintiff continued to experience numbness in his hands and fingers as well as lower extremity numbness and spasticity. (Id.) Dr. Kaczmar wrote that he had had a lengthy discussion with plaintiff and informed him that "his symptoms are a result

1 of his prior spinal cord damage and that further recovery, while possible over the next year,
2 [was] by no means guaranteed." (Id.)  Dr. Kaczmar additionally noted that he had reminded
3 plaintiff "that the primary purpose of surgery was to prevent further deterioration in spinal
4 cord function, which certainly would have occurred in the absence of surgery." (Id.)

Plaintiff brings the instant action under 42 U.S.C. § 1983; he alleges that the delayed surgery has caused him permanent loss of mobility and continuing severe pain.

## DISCUSSION

A.   Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

9

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.  Analysis

In his complaint, plaintiff claims defendants were deliberately indifferent to his serious medical needs because they failed to provide him with prompt spinal surgery following the onset of his symptoms in January 2005, and such delay led to the progressive deterioration of plaintiff's spine and permanent injury. Defendants move for summary judgment on the ground that the undisputed facts show the delay in surgery was not caused by defendants' deliberate indifference and that such delay did not cause harm above and beyond what was the probable result of the spinal condition itself.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Here, it is undisputed that plaintiff suffered from a serious medical need, specifically, his back pain and attendant numbness, weakness and elimination problems. Consequently, the question to be resolved is whether defendants acted with deliberate indifference to that serious medical need.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to

abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." Id. Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

A difference of opinion between a prisoner-patient and prison medical authorities regarding proper treatment does not amount to deliberate indifference. Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). In particular, a plaintiff's opinion that surgery was unduly delayed does not, without more, state a claim of deliberate indifference. Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). Rather, in order to prevail on a claim based on delayed treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, such treatment was chosen in conscious disregard of an excessive risk to the plaintiff's health, and the delay resulted in harm to the plaintiff. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) ("For example, if it were proved at trial that doctors denied a prisoner on dialysis a kidney transplant because of personal animosity rather than in the exercise of honest medical judgment, and that the delay in performing the transplant was "medically unacceptable," that would establish deliberate indifference to a serious medical need.") Consequently, whether defendants unreasonably delayed in providing plaintiff with medical care must include consideration of the nature of the medical need and reason for the delay.

Here, defendants argue, there is no showing that they acted with deliberate indifference to plaintiff's medical needs because: (1) the undisputed evidence demonstrates they did not disregard plaintiff's medical needs, but, rather, that they provided plaintiff with a considerable amount of medically acceptable care; and (2) plaintiff has not shown the delay in surgery caused him harm; specifically, plaintiff has not produced medical records showing that the results of the surgery were any different than they would have been had the surgery not been delayed. In opposition to defendants' motion for summary judgment, plaintiff argues that the evidence as it stands clearly shows unreasonable delay and resulting harm

11

therefrom.[7]

As an initial matter, the Court finds the undisputed facts, when viewed in the light most favorable to plaintiff, could support a reasonable inference that plaintiff did suffer harm from the delayed surgery. Specifically, while defendants focus solely on the results of plaintiff's surgery, the record shows that between January 19, 2005, when plaintiff was first seen for symptoms of pain and numbness, and May 1, 2007, the date on which plaintiff's surgery was performed, plaintiff manifested what a jury could find were worsening and increasingly debilitating symptoms related to his back problems. The record contains evidence, for example, that when plaintiff was first seen at the SVSP medical facility in January 2005 he complained of partial paralysis, that in March 2006, he had difficulty standing and urinating, and that by December 2006, he had to be carried to the emergency room. Based on such evidence, the Court finds a triable issue exists with respect to whether the delay in surgery caused plaintiff harm.

Even assuming such harm, however, plaintiff's claim nonetheless must fail, as there is no evidence that any defendant named herein was responsible for the delay, let alone deliberately indifferent to plaintiff's medical needs. See McGuckin, 974 F.2d at 1062 (finding no deliberate indifference where plaintiff failed to raise genuine issue of material fact regarding whether prison doctors responsible for delays in treatment and surgery that resulted in harm to plaintiff); see also Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir.

---

[7]Plaintiff has filed, together with his sur-reply, a motion for a court-appointed medical expert, specifically, Dr. Kaczmar, to review plaintiff's medical file and provide his opinion with respect to whether defendants acted with deliberate indifference to plaintiff's serious medical needs. Plaintiff's motion will be denied. First, plaintiff, who is proceeding in forma pauperis, is not entitled to the appointment of an expert witness at court expense. The expenditure of public funds on behalf of an indigent litigant is proper only when authorized by Congress. See Tedder v. Odel, 890 F.2d 210, 211 (9th Cir. 1989). The plain language of 28 U.S.C. § 1915, the in forma pauperis statute, does not authorize a district court to waive fees or expenses paid to witnesses. See id. at 211-12. Further, plaintiff has not shown good cause for a continuance to obtain Dr. Kaczmar's expert opinion. See Fed. R. Civ. P. 56(f). In particular, plaintiff's motion contains no sufficient explanation as to plaintiff's failure to seek the medical opinion of Dr. Kaczmar, or any other doctor, during the approximately fourteen months that elapsed between the filing of defendants' motion for summary judgment, on January 29, 2009, and the filing of plaintiff's instant motion, on March 22, 2010.

12

2002) (finding no deliberate indifference where evidence showed delays in treatment not within doctor's control). In particular, the undisputed evidence shows the following with respect to the involvement of Dr. Bowman, Dr. Lee and Dr. Milner in plaintiff's care.

Dr. Bowman did not become involved in plaintiff's care until May 2005, nearly five months after plaintiff first complained of back-related problems. On the same date that Dr. Bowman first saw plaintiff as a patient, Dr. Bowman, in addition to prescribing pain medication and muscle relaxants, referred plaintiff for a neurological consultation.

Dr. Milner's first involvement in plaintiff's care occurred approximately six weeks later, in June 2005, at the time plaintiff had MRI scans taken in preparation for the neurological consultation. Specifically, on the date the MRIs were taken, Dr. Milner prescribed medication for plaintiff to take in preparation for the MRIs.

Although an EMG and nerve conduction tests were performed later, on September 30, 2005, there is no evidence suggesting any defendant was either responsible for ordering or scheduling such additional testing, nor that the timing of those tests was inappropriate.

Two weeks after the additional tests were performed, a nurse wrote in medical notes dated October 15, 2005 that the treatment plan for plaintiff's back problems included a neurology consultation and physical therapy. Five days later, on October 20, plaintiff went to a physical therapy appointment, after which he received a cane and back-brace, and on November 16 he had his neurological consultation with Dr. Muizelaar of U.C. Davis.

Dr. Lee's first involvement in plaintiff's care occurred five days thereafter, on November 21, 2005, at which time Dr. Lee received a letter in which Dr. Muizelaar recommended spinal surgery for plaintiff but requested that a new EMG of plaintiff's leg be performed first. Although the record is silent as to when that EMG was scheduled and/or performed, the record clearly reflects that by February 2, 2006, plaintiff had been scheduled for surgery. Further, although the specific date of that scheduled surgery is not reflected in the record, plaintiff's pre-operative package was to be received at U.C. Davis by no later than February 15, 2006, and the record shows plaintiff had a pre-operative physical examination on that date.

Thereafter, on March 9, 2006, based on the recommendation of an attending physician, Dr. Bowman immediately contacted U.C. Davis to arrange for as early a surgery date as possible. The date scheduled by U.C. Davis is not reflected in the record. The record shows, however, that Dr. Milner saw plaintiff for a pre-operative examination on April 21, 2006 and at that time cleared him for surgery.

Thereafter, plaintiff developed a number of other health problems that required further testing before spinal surgery could be performed.

First, approximately two weeks later, plaintiff was admitted to the emergency room at SVSP, complaining of chest pain and pressure, and the medical record shows that, at the time, plaintiff was awaiting a cardiology consultation prior to his spinal surgery. Additionally, based on abdominal x-rays taken during that admission, Dr. Milner sent plaintiff to Natividad Medical Center to be checked for a possible bowel obstruction, and approximately three weeks later, plaintiff, on a referral by Dr. Lee, was sent to Natividad Medical Center for a pre-operative cardiac screening. The report from that screening was received by Dr. Milner in mid-June and recommended that further tests be performed prior to any surgery, due to plaintiff's borderline EKG, and that the surgery be rescheduled after plaintiff had met with the cardiologist and had been cleared for surgery. On June 30, 2006, Dr. Milner requested the recommended tests.

Although the tests, a thallium scan and ECHO cardiogram, were not performed until, respectively, approximately three weeks and five weeks later, there is no evidence in the record that any defendant was responsible for scheduling the tests or that it was feasible to conduct them on earlier dates, or, even assuming such feasibility, that any defendant was made aware of any delay in their being performed. Moreover, the record reflects that approximately seven weeks later, a physician requested plaintiff receive a neurological consultation prior to his surgery. There is no evidence in the record as to the identity of the physician who made the consultation request or whether the request was timely made. Nor, even assuming an avoidable delay, is there any evidence suggesting any of the defendants was made aware of such circumstances.

14

In any event, the requested consultation did not occur, because the physician's request had not been entered into the computer. There is no evidence that any defendant was responsible for making such computer entries, nor is there any evidence that any defendant was aware of the delay prior to mid-December 2006, when a nurse discovered the problem and informed Dr. Lee of it.

Moreover, Dr. Lee quickly referred plaintiff to Dr. Kaczmar for a neurological evaluation, and plaintiff was seen by Dr. Kaczmar on January 19, 2007, at which time Dr. Kaczmar requested that expedited MRIs be taken.

Shortly after those MRIs were taken, plaintiff was brought to the SVSP emergency room, was diagnosed as possibly having a heart attack, and was transported to an outside hospital.

Two months later, in mid-April 2007, plaintiff was seen by Dr. Kaczmar for another neurological consultation. There is no evidence in the record suggesting the timing of the consultation was within any defendant's control, or that any defendant was aware of a delay, if any, associated with such consultation. Following the consultation, Dr. Kaczmar recommended spinal surgery be performed at the earliest opportunity. On May 1, 2007, Dr. Kaczmar performed that surgery.

Based on the above undisputed evidence, the Court concludes no triable issue of fact has been raised with respect to deliberate indifference on the part of Dr. Bowman, Dr. Lee or Dr. Milner. Rather, the undisputed evidence shows that the defendants responded to plaintiff's complaints, prescribed medication for him, referred him for neurological consultations, sent him for multiple pre-operative tests and examinations, arranged for plaintiff to obtain spinal surgery at a leading medical center, and endeavored to coordinate care for plaintiff's various serious medical conditions. To the extent any error arguably was made in the course of plaintiff's treatment, or any delay in his surgery arguably could have been avoided, any such error and/or delay is, at best, attributable to professional negligence rather than a conscious disregard of a risk to plaintiff's health.

Accordingly, the Court finds defendants are entitled to summary judgment on

plaintiff's Eighth Amendment claim of deliberate indifference to his serious medical needs.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED.

Plaintiff's motion for the appointment of a medical expert is hereby DENIED.

This order terminates Docket Nos. 33 and 48.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: March 31, 2010

_____
MAXINE M. CHESNEY
United States District Judge